# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TODD UNDERWOOD,            ) | |
|                            ) | |
|      Plaintiff,            ) | |
|                            ) | |
| vs.                        ) | Case No.  07-2268 KHV |
|                            ) | |
| NMC MORTGAGE CORPORATION,  ) | |
| PREVIOUSLY KNOWN AS MYERS  ) | |
| NATIONAL MORTGAGE COMPANY, ) | |
|                            ) | |
|      Defendant.            ) | |

## COMPLAINT

Plaintiff, Todd Underwood, by and through his counsel of record, David W. Hauber and Nicholas J. Porto of the law firm of Baty, Holm & Numrich, P.C., for his Complaint against defendant NMC National Mortgage Corporation, previously known as Myers National Mortgage Company (hereinafter "National Mortgage Company") states and alleges as follows:

### The Parties

1. Plaintiff is a citizen of the state of Kansas.

2. Defendant is a Kansas corporation with its principal place of business in Overland Park, Kansas, and may be served with process by serving PW&S Agent Services of Kansas, Inc., 6201 College Boulevard, Suite 500, Overland Park, Kansas 66211.

## Jurisdiction and Venue

3. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this matter arises under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

4. Plaintiff has satisfied all jurisdictional prerequisites, having filed a formal charge of discrimination with the Equal Opportunity Commission ("EEOC") on November 8, 2006, and having filed suit within ninety (90) days of receiving Notice of his Right to Sue.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) and (3) as the conduct alleged herein occurred in this district and defendant may be served here.

## General Allegations

6. Plaintiff Todd Underwood is a 28 year-old male who suffers from muscular dystrophy, a fact which was known to defendant.

7. Plaintiff's muscular dystrophy hinders his ability to use his fine motor skills, such as properly holding a writing instrument, which results in handwriting that is nearly illegible, and also causes him to walk with a pronounced limp.

8. Defendant National Mortgage Company is a residential mortgage lender with 8 office locations serving twelve states nationwide, including Kansas.

9. Defendant's President/Owner is Randy Kent.

10. Plaintiff was hired by defendant's Overland Park branch September, 2004 as a financial specialist.

11. The manager of the Overland Park branch during plaintiff's tenure was Nick Underwood; the assistant manager was initially Kevin Putney who was replaced by Rick Kent, the younger brother of Randy Kent.

12. National Mortgage Company pays its financial specialists on a commission only basis.

13. If a financial specialist does not earn any commissions in a given pay period, they are paid nothing.

14. Financial specialists, including plaintiff, routinely experienced workweeks in which they were not paid wages in an amount equal to or greater than the federal minimum wage.

15. Financial specialists, including plaintiff, also routinely worked in excess of 40 hours per workweek.

16. Bill Galloway, defendant's Chief Executive Officer, and Nick Underwood, a branch manager, instructed all financial specialists, including plaintiff, to fill out all time-sheets to indicate that they worked precisely 40 hours per week, regardless of how many hours they actually worked.

17. Any time-sheet that indicated that a financial specialist worked in excess of 40 hours in a given week was rejected by defendant.

18. Plaintiff was never paid overtime wages for those weeks where he worked in excess of 40 hours.

19. Plaintiff's primary duty as a financial specialist was to receive incoming phone calls from potential customers and to complete phone mortgage applications for each customer.

20. The majority of incoming phone calls are responsive to radio advertising.

21. Incoming calls are received by defendant's receptionist, and an announcement is then made to all of the financial specialists that there is a call waiting.

22. The first specialist to answer the call then gets the benefit of completing the caller's application for a mortgage loan and profits from any commission generated therefrom.

23. Applications are hand-written by the financial specialist and then walked to another of defendant's employees who processes the same.

24. The income of financial specialists, including plaintiff, is solely dependent on the volume of mortgage loans closed.

25. Therefore, the more loans a financial specialist closes, the more his or her income would increase.

26. Though plaintiff experienced success as a financial specialist and was one of the top producers at the Overland Park branch, he routinely received complaints from the individuals processing his applications that they could not read his handwriting, resulting in delays and also humiliation.

27. Plaintiff also struggled to walk from his office to the location where the

applications were submitted, resulting in delays.

28. On one occasion, Rick Kent, observed plaintiff's poor handwriting and publically humiliated him in front of his co-workers, stating that he "should go back to the third grade and learn how to write."

29. On another occasion, Randy Kent humiliated plaintiff in front of his co-workers by telling him that if he closed a certain number of loans that he "would buy plaintiff a pair of corrective shoes."

30. In March of 2005, in order to avoid further problems with defendant's employees reading his handwriting and increase his productivity, plaintiff requested that defendant provide him with a computer so that he could type customers' applications.

31. Nick Underwood, the manager of the Overland Park branch, informed plaintiff that he "would work on it."

32. Plaintiff informed Mr. Underwood that a computer was a necessary accommodation for the performance of his job duties as a financial specialist.

33. Mr. Underwood informed Randy Kent of plaintiff's request.

34. Defendant failed to timely accommodate plaintiff's request for a computer, so plaintiff informed Mr. Underwood that a computer was a reasonable request as defined by the Americans with Disabilities Act and printed off a copy of the same for defendant's review.

35. Though plaintiff continued to follow up on his request for a computer to

defendant's management, by May of 2006 plaintiff had still yet to receive a computer.

36. In May 2006, a fellow financial analyst was given a computer so that he could effectively process overflow internet leads less than a week after he had requested the same.

37. Because he had not received a computer despite first requesting one over a year earlier, plaintiff contacted the Muscular Dystrophy Association (MDA) who referred plaintiff to legal counsel for advice on how to proceed.

38. Shortly thereafter, plaintiff again requested a computer from defendant's branch manager Nick Underwood, who informed plaintiff that he was "still working on it."

39. Plaintiff then informed Mr. Underwood that he had contacted the MDA and requested that Mr. Underwood increase his efforts.

40. Mr. Underwood told plaintiff that if he had told Randy Kent of plaintiff's contact with the MDA, that Mr. Kent "would fire his ass on the spot."

41. Later that same day, plaintiff was confronted in his office by Randy Kent who told plaintiff that his contacting the MDA "was chickenshit."

42. Randy Kent also told plaintiff that his first inclination was "to fire your (plaintiff's) ass and let you (plaintiff) sue."

43. Randy Kent further told plaintiff that he "had no incentive to hire crippled people because they will turn around and sue the first chance they get."

44. After this encounter, Leo Harvey, also a financial specialist, heard Randy Kent tell Nick Underwood that plaintiff's request of a computer made Randy Kent "never want

to hire a cripple again."

45. On a previous occasion, Mr. Harvey and fellow financial specialist Beau Bryan witnessed Randy Kent inform plaintiff that if obtained certain monthly bookings Mr. Kent would buy plaintiff a pair of corrective shoes.

46. It was not uncommon for Mr. Kent to make derogatory remarks about defendant's employees.

47. For example, on one occasion, Mr. Kent told Mr. Harvey, who is dark complected and appears to be of Middle-Eastern descent, that if he didn't have a higher monthly collection that Mr. Kent would "wrap a towel around his head and tie his ass to the flag pole in front of National Mortgage Company and let people throw rocks at his head."

48. Approximately two days after his meeting with Randy Kent, plaintiff was finally issued a computer.

49. Immediately after receiving the computer, plaintiff's communication improved.

50. Later, on May 23, 2006, defendant's entire staff convened for a meeting where defendant distributed its new employee handbook.

51. At said meeting, Rick Kent jokingly asked plaintiff, while looking at him, if there were "any changes to the company's disability policy," causing the entire staff to burst out with laughter.

52. Plaintiff was again humiliated by Kent's comment and expressed his concern to Nick Underwood, who assured plaintiff that he would discipline Mr. Kent.

53. After this incident, Rick Kent displayed a hostile attitude towards plaintiff and sought to discipline plaintiff for conduct that was commonly overlooked.

54. Plaintiff indicated his written concern about Rick Kent's behavior to defendant, including Randy Kent, on June 7, 2006.

55. Less than two weeks after this incident, Leo Harvey informed plaintiff that he could no longer associate with him because plaintiff had "too big of a target on his back."

56. During plaintiff's tenure with defendant, it was common practice for defendant to conduct "pendaflex raids" where management would sift through the financial specialists' customer files to determine if customers' inquirres had been followed up.

57. Defendant rarely disciplined financial analysts if delinquent files were discovered, and defendant's employees were rarely "written-up."

58. Both Mike Cash, a former financial specialist, and Monte Hustedee, a current financial specialist, were not disciplined when defendant discovered that each had delinquent files in their possession.

59. Monte Hustedde was eventually promoted to defendant's assistant branch manager, a position he still holds.

60. On Friday, August 4, 2006, defendant conducted a pendaflex raid and purportedly discovered 28 delinquent mortgage applications in plaintiff's office.

61. Later that day, plaintiff was written up by defendant's branch manager, Nick Underwood, and threatened with termination if he failed another pendaflex raid.

62. After Friday August 4, 2006, plaintiff did not return to work again until Wednesday August 9, 2006, due to the weekend and an illness.

63. The same day plaintiff returned to work defendant promptly conducted another pendaflex raid and purportedly "discovered" another eight delinquent applications.

64. As plaintiff had not worked since the previous pendaflex raid, the applications discovered on Wednesday, August 9, 2006 were the same as those which existed at the time plaintiff had been discliplined.

65. After discovering the eight "new" files, defendant promptly terminated plaintiff.

## Count I
## Retaliation Under the ADA

66. Plaintiff incorporates paragraph numbers 1 through 65 as if more fully stated herein.

67. Plaintiff engaged in a protected activity by asserting his rights under the Americans With Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq. (hereinafter the "ADA").

68. Defendant terminated plaintiff in retaliation for engaging in a protected activity for seeking an accommodation and complaining about harassment at the work place.

WHEREFORE, plaintiff prays for relief and judgment as follows:

a) A permanent injunction enjoining defendant, its officers, directors, employees, successors, heirs and assigns, and all persons in concert or participation with them, from

engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the ADA.

b) An order commanding defendant to institute and implement, and individual members of defendant to attend and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities for persons with present, past, or perceived disabilities;

c) A judgment awarding plaintiff monetary damages for his lost wages, back pay, front pay, and interest, and for such other compensatory damages that resulted in pecuniary loss, and past and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

d) An award of plaintiff's reasonable attorney's fees and costs in procuring this action pursuant to 42 U.S.C.A. § 12205; and

e) An award of punitive damages allowable by law pursuant to 42 U.S.C.A. §§ 12111-12117, and for such further and other relief as the Court may deem appropriate or just and equitable under the circumstances.

### Count II
### Discrimination Under the ADA

69. Plaintiff incorporates paragraph numbers 1 through 68 as if more fully stated herein.

70. Plaintiff suffered from muscular dystrophy during his employment with defendant, which is a disability as defined by the ADA.

71.    Plaintiff was able to perform the essential function of his job, either with or without the reasonable accommodation of a computer.

72.    Defendant discharged plaintiff because of his disability in violation of the ADA.

WHEREFORE, plaintiff prays for relief and judgment as follows:

a)    A permanent injunction enjoining defendant, its officers, directors, employees, successors, heirs and assigns, and all persons in concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the ADA.

b)    An order commanding defendant to institute and implement, and individual members of defendant to attend and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities for persons with present, past, or perceived disabilities;

c)    A judgment awarding plaintiff monetary damages for his lost wages, back pay, front pay, and interest, and for such other compensatory damages that resulted in pecuniary loss, and past and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

d)    An award of plaintiff's reasonable attorney's fees and costs in procuring this action pursuant to 42 U.S.C.A. § 12205; and

e)    An award of punitive damages allowable by law pursuant to 42 U.S.C.A. §§ 12111-12117, and for such further and other relief as the Court may deem appropriate or just

and equitable under the circumstances.

## Count III
### Failure to Reasonably Accommodate Under the ADA

73. Plaintiff incorporates paragraph numbers 1 through 72 as if more fully stated herein.

74. Plaintiff suffered from muscular dystrophy during his employment with defendant, which is a disability as defined by the ADA.

75. Defendant had notice of plaintiff's disability.

76. Had defendant reasonably accommodate plaintiff's requested of a computer he would have been able to perform his job adequately.

77. Defendant unreasonably refused to accommodate plaintiff's request for a computer for over a year.

WHEREFORE, plaintiff prays for relief and judgment as follows:

a) A permanent injunction enjoining defendant, its officers, directors, employees, successors, heirs and assigns, and all persons in concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the ADA.

b) An order commanding defendant to institute and implement, and individual members of defendant to attend and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities for persons with present, past, or perceived disabilities;

c)  A judgment awarding plaintiff monetary damages for his lost wages, back pay, front pay, and interest, and for such other compensatory damages that resulted in pecuniary loss, and past and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

d)  An award of plaintiff's reasonable attorney's fees and costs in procuring this action pursuant to 42 U.S.C.A. § 12205; and

e)  An award of punitive damages allowable by law pursuant to 42 U.S.C.A. §§ 12111-12117, and for such further and other relief as the Court may deem appropriate or just and equitable under the circumstances.

### Count IV
### Hostile Work Environment Under the ADA

78. Plaintiff incorporates paragraph numbers 1 through 77 as if more fully stated herein.

79. Plaintiff is a qualified individual who suffers from muscular dystrophy, a disability as defined by the ADA.

80. Plaintiff was harassed, mocked, and humiliated by defendant's employees and president, Randy Kent, throughout his employment because of his disability.

81. Said harassment was sufficiently severe or pervasive so as to alter a term of plaintiff's employment.

WHEREFORE, plaintiff prays for relief and judgment as follows:

a)  A permanent injunction enjoining defendant, its officers, directors, employees,

successors, heirs and assigns, and all persons in concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the ADA.

    b)    An order commanding defendant to institute and implement, and individual members of defendant to attend and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities for persons with present, past, or perceived disabilities;

    c)    A judgment awarding plaintiff monetary damages for his lost wages, back pay, front pay, and interest, and for such other compensatory damages that resulted in pecuniary loss, and past and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

    d)    An award of plaintiff's reasonable attorney's fees and costs in procuring this action pursuant to 42 U.S.C.A. § 12205; and

    e)    An award of punitive damages allowable by law pursuant to 42 U.S.C.A. §§ 12111-12117, and for such further and other relief as the Court may deem appropriate or just and equitable under the circumstances.

## Count V
## Fair Labor Standards Act

82.    Plaintiff incorporates paragraph numbers 1 through 81 as if more fully stated herein.

83.    Financial specialists employed by defendant were subject to the minimum wage

and maximum hour provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

84. In certain workweeks, financial specialists, including plaintiff, were not provided with pay at or above the federal minimum wage, 29 U.S.C. § 206.

85. Financial specialists, including plaintiff, routinely worked more than 40 hours in a given workweek, but were not provided with overtime pay.

86. Defendant knew or should have known that plaintiff routinely worked in excess of 40 hours per week.

87. Defendant willfully refused to pay minimum wages to plaintiff for each workweek.

88. Defendant willfully refused to provide plaintiff with overtime wages for any workweek where he worked in excess of 40 hours.

89. Defendant's failure to pay minimum and overtime wages to plaintiff violates the provision of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

WHEREFORE, plaintiff submits defendant is liable for his unpaid wages and unpaid overtime, plus interest, and an award of plaintiff's reasonable attorney's fees and costs in procuring this action.

Respectfully submitted,

BATY, HOLM & NUMRICH, P.C.


By   /S/ DAVID W. HAUBER
DAVID W. HAUBER    KS#11798
NICHOLAS J. PORTO    KS#21984
4600 Madison, Suite 210
Kansas City, MO 64112-3012
(816) 531-7200
(816) 531-7201 fax
Attorneys for Plaintiff


### Right to Trial By Jury

Plaintiff hereby demands trial by jury of all matters so triable.

By   /s/ DAVID W. HAUBER


### Designation of Place of Trial

Plaintiff hereby designates the place of trial to be in Kansas City, Kansas.

By   /s/ DAVID W. HAUBER