**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

TODD UNDERWOOD,
on behalf of himself and other past
and present employees similarly situated,

*Plaintiffs*,

vs.

Case No. 07-2268-EFM

NMC MORTGAGE CORPORATION,
PREVIOUSLY KNOWN AS MYERS
NATIONAL MORTGAGE COMPANY,
and RANDY KENT,

*Defendants.*

**MEMORANDUM AND ORDER**

Before the Court is Defendant's Motion for Summary Judgment (Doc. 124).  The motion has

been fully briefed. For the following reasons, the Court denies the motion.

**I. Facts[1]**

Thirty-two plaintiffs claim that Defendant NMC Mortgage Company ("NMC") violated the

---

[1]Plaintiffs' response brief was 281 pages long with 248 pages devoted to controverting facts.  In many instances, Plaintiffs controverted one fact with approximately twenty-six pages of facts, and numerous facts were controverted by merely repeating the same twenty-six pages of controverting facts.  Plaintiffs repeated one factual response twice resulting in an additional twenty-six pages of duplicative facts. Plaintiffs' "additional fact section" also contained duplicative facts as many of the facts were already stated to "controvert" Defendant's factual statements.  Despite all this volume, many of Defendant's facts were not directly controverted by Plaintiff.  Pursuant to D. Kan. Rule 56.1, all material facts shall be deemed admitted unless specifically controverted by the statement of the opposing party.  Accordingly, facts will be admitted as uncontroverted if Plaintiffs did not specifically controvert them.

Fair Labor Standards Act ("FLSA") and various state wage and hour laws.[2]  Plaintiffs worked as "financial specialists" for NMC.  Financial specialists worked with consumers in completing mortgage applications and finding lenders that met the customer's criteria for obtaining residential loan funding.  NMC's office in Overland Park, Kansas served as NMC's corporate headquarters for some time.  NMC advertised its services and received phone calls from prospective customers. When consumers applied for a loan using NMC's services, they could get approved in 5 to 10 minutes.

NMC did not make loans with its own money, but loans obtained through NMC's services were funded by a lender separate from NMC.  NMC did not hold bank accounts and did not utilize its own money to fund loans for consumers.  NMC did not accept consumer deposits, buy loans, sell loans, extend credit, or hold mortgages.

A "first payment letter" is correspondence sent to a consumer that indicates that the consumer is to send their payments to a specified lender even though the consumer's loan may have been closed with NMC.  NMC never sent a "first payment letter," but the particular lender involved in the loan sent the letter.  On the occasions where consumers sent their mortgage payments to NMC instead of to their lenders, NMC forwarded the checks to the lenders.

During the time it was in business, NMC dealt with approximately 50-80 different lenders. "Table funding" is a practice in which the loan closes in the name of NMC, but the lender funds all of the loan, sends the first payment letter, and handles all of the required disclosures. Table funding allowed NMC to process loan applications quicker because it could underwrite the files itself.  NMC employed its own underwriters. NMC engaged in table funding with only one lender, Ohio Savings

---

[2]Plaintiffs filed an unopposed motion to amend the pretrial order to reflect that there are actually thirty-three remaining opt-in plaintiffs which the Court granted on March 27, 2009. (Doc. 140).  In the motion for summary judgment, however, there are only facts and arguments pertaining to thirty-two plaintiffs.

Bank.  The majority of the "table funded" loans occurred in the Overland Park, Kansas office, although other branches started coming on later.

Some state banking authorities consider an entity to be a "lender" if the entity's name appears on the closing document, i.e., the HUD statements, while other states consider the entity to be a "broker" under these circumstances.   NMC indicated to the State of Kansas that it completed 661 loan transactions for a total of $80,698,640 in 2004; 622 loan transactions for a total of $76,557,909 in 2005, and 402 loan transactions for a total of $49,339,731 in 2006.[3] From 2004 to 2006, NMC closed approximately 22 loans in its own name.

Randy Kent was the president of NMC.[4]  He stated that as of February 1, 2005, NMC did not have any kind of system for recording the hours worked by financial specialists.  NMC started keeping time records in February of 2005.  Financial specialists were paid on a commission basis.[5] During the pertinent time frame in this lawsuit, the federal minimum was $5.15 per hour. NMC had a uniform policy for financial specialists' schedules throughout all of its branches. Mr. Kent stated that it was a violation of NMC's policy for a financial specialist to report overtime hours on their

---

[3]In these annual reports given to the State of Kansas, one line asks for the number of loans and the amount of those loans in which the Defendant acted as "lender."  It states that "lender = loans closed in your name."  NMC reported that it acted as a "lender" for 165 loans totaling $21,357,733 in 2004; 176 loans totaling $24,907,987 in 2005; and 81 loans totaling $11,387,671 in 2006.

[4]NMC went out of business in 2008.

[5]Defendant stated that prior to 2005, financial specialists were paid a monthly draw of $1,400 and if the specialist did not generate $1,400 in monthly commissions, the specialist would have to repay NMC the difference between the $1,400 and the amount of the commissions. Defendant stated that it changed its compensation policy in 2004 or early 2005, and after the change in policy, financial specialists were paid a minimum monthly salary of $1,000 and even if the specialist did not generate $1,000 in commissions that month, he could keep the $1,000 and not repay anything to NMC.  Plaintiffs dispute this fact by referring the Court to Brian Weatherman's affidavit, the former regional manager of several of NMC's branches.  In Weatherman's affidavit, he states that although NMC offered specialists a bimonthly draw, the specialist would have to repay the draw the following month. It is not clear, however, whether Mr. Weatherman was addressing the compensation policy prior to or after the change in policy in 2004 or early 2005. As such, the Court is not clear whether financial specialists were paid solely on a commission basis after the policy change in early 2005.

time sheets.[6]

Plaintiffs' third amended complaint includes claims under the FLSA for failure to pay minimum and overtime wages to Plaintiffs and failure to maintain sufficient records, and violations of various state wage payment laws.[7]  Defendant states that it seeks summary judgment as to Plaintiffs' FLSA and state wage and hour claims.[8]

## II.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[9]  "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[10]  A fact is "material" when "it is essential to the proper disposition of the claim."[11]  The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[12]  The court cannot evaluate credibility or weigh the evidence.[13]

The moving party bears the initial burden of demonstrating the absence of a genuine issue

---

[6]The parties dispute the hours the Plaintiffs worked which will be discussed later in this Order.

[7]These states include: Kansas, Indiana, Georgia, Colorado, Pennsylvania, Missouri, Arizona, Tennessee, New Mexico, and West Virginia.  Doc. 84. One Plaintiff also asserted claims relating to the Americans with Disabilities Act ("ADA"), but those claims have since been dismissed.  Doc. 139.

[8]Defendant does not specifically address any of the state law claims or specifically address the deficient records claim under the FLSA. Defendant also does not specifically address Randy Kent's liability although Mr. Kent was named individually as a defendant in the lawsuit. Accordingly, these issues are not before the Court.

[9]Fed. R. Civ. P. 56(c).

[10]*Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[11]*Id.*

[12]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[13]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994).

of material fact.[14]  In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[15]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[16]  The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[17]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[18] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[19]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[20]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[21]

## III.  Analysis

Defendant asserts that it is entitled to summary judgment because Plaintiffs' FLSA and state

---

[14]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[15]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[16]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[17]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[18]*Adler*, 144 F.3d at 671.

[19]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[20]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[21]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

wage and hour claims are precluded under the "retail or service establishment" exemption and Plaintiffs have not produced sufficient evidence demonstrating a genuine issue of material fact as to whether any Plaintiff was eligible for overtime compensation.  Defendant also asserts that if the Court does not grant summary judgment in its entirety, it should grant summary judgment as to Plaintiffs' claims occurring prior to October 1, 2005 and Plaintiffs' liquidated damage claims because Plaintiffs cannot demonstrate that NMC wilfully violated the FLSA or state wage and hour laws.

### A.  Retail and Service Establishment Exemption

The FLSA requires employers to compensate its employees engaged in commerce for a workweek longer than forty hours at a rate not less than one and one-half times the regular rate of the employee's compensation.[22]   The FLSA, however, contains certain exemptions from this overtime requirement.  "FLSA exemptions are to be narrowly construed against . . . employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit."[23] An employer claiming the exemption has the burden of proving that the exemption is applicable.[24]

Defendant contends that it is exempt from the FLSA's requirement of paying employees overtime because it is a retail and service establishment.  Section 207(I) states:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents

---

[22]29 U.S.C. § 207(a)(1).

[23]*Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d. 79 (1997) (internal quotations and citation omitted).

[24]*Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008).

-6-

commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

Although section 207(I) does not define "retail or service establishment," Congress defined the term in section 213(a)(2).[25] Section 213(a)(2) defines "retail or service establishment" as "an establishment 75 percentum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." Section 213(a)(2), however, has since been repealed.[26]

Neither the Tenth Circuit or the District of Kansas have addressed whether the definition previously found in section 213(a)(2) remains applicable in determining whether a business qualifies as a "retail or service establishment." Several other circuits, however, have addressed the issue and have concluded that the definition previously set forth in section 213(a)(2) remains applicable.[27] After reviewing the legislative history, the Eight Circuit noted that there was no congressional intent to discard thirty years of meaning, and the Ninth Circuit later adopted this reasoning.[28] This Court finds the Eight and Ninth Circuit's reasoning persuasive.

---

[25]*See, e.g., Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993); 29 C.F.R. § 779.24; 29 C.F.R. § 779.411.

[26]*See Reich*, 3 F.3d at 1183.

[27]*Reich*, 3 F.3d 1181; *Geig v. DDR, Inc.*, 407 F.3d 1038 (9th Cir. 2005).

[28]*Reich*, 3 F.3d at 1183; *Geig*, 407 F.3d at 1047.

In addition, the regulations promulgated by the Department of Labor, i.e, 29 C.F.R. §779.24 and 29 C.F.R.§ 779.411, which acquire the meaning of "retail and service establishment" from section 213(a)(2) have not been repealed. The Tenth Circuit has stated that "[t]he Department of Labor regulations are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA."[29] As such, these regulations also indicate that the definition of "retail or service establishment" previously contained in 29 U.S.C. § 213(a)(2) remains applicable.

Several other Department of Labor regulations help in defining retail or service establishment. For example, 29 C.F.R. § 779.318(a) states that a retail or service establishment "serves the everyday needs of the community in which it is located," "serves the everyday needs of the community," and is "at the very end of the stream of distribution." 29 C.F.R. § 779.317 provides a partial list of establishments that lack the "retail concept" which includes credit companies, including small loan and personal loan companies, finance companies, investment counseling firms, and loan offices. 29 C.F.R. § 779.320 provides a partial list of establishments that may be recognized as retail.

In *Mitchell v. Kentucky Finance Company*,[30] the United States Supreme Court considered whether a business that made personal loans was a "retail or service establishment" within the meaning of 29 U.S.C. § 213(a)(2). It noted that the Department of Labor had previously ruled that "business entities in what may broadly be called the 'financial industry' were not within the scope

---

[29]*Clements*, 530 F.3d at 1227 (citations and quotation omitted).

[30]359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

of that exemption."[31]   The court in examining the legislative history and Congress' intent concluded that enterprises such as banks, credit companies, and personal loan companies were within the financial field and could not qualify as a "retail or service establishment."[32]

Defendant asserts that this Court should follow the holding in *Gatto v. Mortgage Specialists of Illinois, Inc.*[33] because the facts in this case fit squarely within those present in *Gatto*.  In *Gatto*, plaintiff sued her employer for failure to pay her time and half for overtime hours in violation of the FLSA.  The plaintiff was employed as a "loan officer" who worked solely on commission which was based on loans that were closed with approved lenders.[34] Her employer, Mortgage Specialists, was in the business of finding and closing residential mortgage loans and matching customers with qualified lenders.[35]   Mortgage Specialists did not make buy or sell loans, extend credit, or hold mortgages.[36]  It also was not a bank, finance company, credit company, or loan company.[37]

In *Gatto*, the Northern District of Illinois first considered whether Mortgage Specialists was part of the financial industry.  In finding this, the court looked at its state law which defined "loan brokering" or "brokerage service."[38]  The court found that Mortgage Specialists, as a broker, did not

---

[31]*Id*. at 292.

[32]*Id*. at 295-96.

[33]442 F.Supp.2d 529 (N.D. Ill. 2006).

[34]*Id.* at 532-33.

[35]*Id*. at 532.

[36]*Id.*

[37]*Id.*

[38]*Id*. at 539.

provide the loan but only provided assistance in obtaining the loan.[39]   In addition, the court relied on Illinois law that stated mortgage brokers were "*nonfinancial* intermediaries."[40] The court concluded that Mortgage Specialists was "not part of the 'financial industry' as that term was used in *Mitchell*."[41]

The court in *Gatto* next determined that Mortgage Specialists met the "retail or service establishment" exemption.  In finding this, the court stated that even though several types of brokers were listed as lacking a retail concept in 29 C.F.R. § 779.317, this did not preclude Mortgage Specialists, a "mortgage broker," from claiming the retail exemption.[42]  The court then found that Mortgage Specialists met the three characteristics of a retail or service establishment listed in 29 C.F.R. § 779.318(a) because it (1) sold to the general public; (2) served the everyday needs of the public; and (3) was at the very end of the stream of distribution because it was hired "to perform the discreet tasks of finding and closing loans, second mortgages, and home equity loans and the refinancing of existing loans," and its job was done once the loan was closed.[43]

Plaintiffs assert that the facts are analogous to the facts in *Saunders v. Ace Mortgage Funding, Inc.*,[44] in which that court distinguished *Gatto* and found that the retail or service establishment exemption did not apply.  In *Saunders*, plaintiffs brought a collective action under the

---

[39]*Id.*

[40]*Id*. at 539-40 (emphasis in original).

[41]*Id*. at 540.

[42]*Id.*

[43]*Id*. at 540-41.

[44]2007 WL 1190985 (D. Minn. 2007).

FLSA seeking overtime and minimum wage compensation from their employer.[45]  The employer, Ace Mortgage ("Ace"), matched mortgage borrowers with lenders for a fee.[46]  Ace primarily brokered loans, but it also engaged in a small amount of direct lending called "table funding" where the bank provided the funding for the loan but the loan closed in Ace's name.[47]  Ace also closed a small number of loans in its own name using its warehouse line of credit.[48]

In *Saunders*, the District of Minnesota examined whether Ace was part of the "financial industry" because the businesses listed in 29 C.F.R. § 779.317 that lacked a retail concept included "credit companies," "small loan and personal loan companies," and "finance companies."[49]  29 C.F.R. § 779.317 specifically cites to *Mitchell* for the proposition that these type of financial businesses lack a retail concept.[50]  The *Saunders* court found that the facts in *Gatto* were factually distinguishable because Ace engaged in a small amount of direct lending and declined to use the reasoning in *Gatto*.[51]  It concluded that Ace was part of the financial industry and therefore could not qualify as a retail or service establishment as a matter of law and that the *Gatto* court ultimately "strained to bring a financial business within the definition of a retail or service establishment on the basis that its activities were limited to brokering, not lending."[52]

---

[45]*Id.* at *1.

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]*Id.* at *5.

[50]29 C.F.R. § 779.317.

[51]*Saunders*, 2007 WL 1190985 at *6.

[52]*Id.*

The facts in this case are similar to the facts in both *Gatto* and *Saunders*. NMC matched customers with lenders in finding residential loans but did not represent the consumer or the lender. Unlike the defendant in *Gatto* but similar to the defendant in *Saunders*, NMC engaged in table funding in which the loan closed in NMC's name. Although NMC did not use its own line of credit for closing loans like the defendant in *Saunders*, the Court finds the facts more analogous to the facts in *Saunders*.

Everything about NMC's business is related to the financial industry. NMC matched consumers with loans. NMC processed the loan applications. NMC engaged in table-funding so the loan closed in the name of NMC. In contrast to Illinois law where mortgage brokers are defined as "nonfinancial intermediaries," in Kansas, NMC's name appeared on the closing loan documents as a "lender" because NMC engaged in table-funding. In its annual report to Kansas, NMC had to report that it was a "lender" from 2004 through 2006 on 422 loans totaling $57,653,391. Finally, NMC underwrote these table-funded loans which indicates more than peripheral involvement in the financial aspects of providing the loan to the consumer. Accordingly, this Court concludes that NMC is within the financial industry and therefore should not be considered a "retail or service establishment."

Even if this Court were to conclude that NMC was not within the financial field, NMC still lacks the characteristics that would qualify it as a "retail or service establishment." As the Department of Labor's regulations make clear, the three characteristics of a retail or service establishment include (1) selling to the general public; (2) serving the everyday needs of the public; and (3) being at the very end of the stream of distribution.[53]   Examples of such establishments

---

[53] 29 C.F.R. § 779.318(a).

include grocery stores, furniture stores, and restaurants.[54]   NMC is not similar to these retail establishments as it does not appear to the Court that matching individuals with residential mortgage lenders would qualify as selling to the "general public" or serving the "everyday needs" of the public.       In any event, NMC is not at the very end of the stream of distribution. In *Partida v. American Student Loan Corporation*,[55] the District of Arizona addressed this third element when determining whether a company in the business of matching individuals with third-party lenders to consolidate student loans was a retail or service establishment. The court stated that the defendant's business was "an integral and upstream part of the loan origination business and therefore is on the non-retail end of the establishment spectrum."[56]   As the *Partida* court noted,  "[a] loan referral provides the basis for a subsequent transaction in which an individual obtains what he or she ultimately seeks - a [residential] loan."[57] The court in *Partida* concluded that because the business was not at the end of the stream of distribution, the business could not be considered a "retail or service establishment."[58]

NMC's business was similar to the business in *Partida* in that it matched individuals with residential loans.  NMC was not providing the end product but was directing the individual to the residential loan. The Tenth Circuit has noted that "[b]usinesses that serve only other commercial

---

[54]*Id.*

[55]2008 WL 190440 (D. Ariz. 2008).

[56]*Id.* at *4. The *Partida* court also took issue with the *Gatto* ruling and noted that it appeared that *Gatto* had misapplied the Ninth Circuit's ruling in *Geig*. *Id. at *3*.  The *Partida* court stated that the Ninth Circuit in *Geig* held that certain employees were exempt from FLSA's overtime provisions "not because they were engaged in financing activities as *Gatto* suggests, but because they were employed in auto dealerships-entities that undisputably constitute 'retail or service establishment[s]." *Id.* at *3.

[57]*Id.* at *4.

[58]*Id.*

establishments are generally not within the 'retail concept' of the exemption."[59] This Court cannot conclude that NMC was at the very end of the stream of distribution.  As such, it lacks the characteristics of a retail or service establishment.

Finally, this Court finds 29 C.F.R. § 779.317 instructive.  This regulation provides a list of establishments that lack a retail concept and includes freight brokers, insurance brokers, and stock or commodity brokers.  Although "mortgage brokers" were not included, the regulation specifically states that it is a "partial list" of businesses.  A "mortgage broker" is similar to an "insurance broker" or "stock or commodity broker" because the broker assists the customer in obtaining the mortgage, insurance, or stock. The majority, if not all, of Defendant's business was done as a "broker." Because a mortgage broker is similar to the brokers listed in section 779.317, the Court finds that NMC lacks the "retail concept" to be qualified as a "retail or service establishment."  Exemptions are to be narrowly construed under the FLSA, and NMC is not a retail or service establishment under 29 U.S.C. § 207(i) and therefore is not entitled to this exemption.

**B. Whether Plaintiffs are Eligible for Overtime Compensation**

Defendant contends that another basis for granting summary judgment is that Plaintiffs have failed to produce any evidence that they worked any overtime hours.  Although  Defendant asserts that none of Plaintiffs' time sheets reflect that any Plaintiff ever worked overtime while employed by NMC, Plaintiffs state that they were instructed to not put more than 40 hours on their time cards.[60] As such, there is a factual dispute between the parties as to the amount of hours Plaintiffs

---

[59]*Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir. 1981) (citation omitted).

[60]Plaintiffs also state that Defendant kept inadequate time records and the records cannot be trusted which raises a genuine issue of material fact.

worked.[61]        Defendant asserts that Plaintiffs' statements that they worked overtime and that they were instructed to not put more than 40 hours on their time cards are self-serving and conclusory, Plaintiffs, however, also submitted affidavits from two former managers at NMC who are not parties to the lawsuit.  In these affidavits, Nick Underwood and Brian Weatherman state that financial specialists were instructed to fill out their time cards indicating that they worked precisely 40 hours a week regardless of how many hours they actually worked and that time cards reflecting hours above 40 would be rejected.  In addition, Underwood and Weatherman stated that it was commonplace for financial specialists to work over 40 hours a week despite their time cards indicating the contrary.

        In its reply, Defendant submitted two affidavits from Randy Kent and Bill Galloway stating that Underwood's and Weatherman's statements in their affidavits were false.[62] Defendants argue that there are many time cards which reflect a number of hours worked different than 40 hours. However, there are no time cards indicating any specialist worked more than 40 hours a week.  At summary judgment, the Court will not make credibility determinations or weigh the evidence.  As is evident, there is a genuine factual dispute regarding whether specialists worked in excess of 40 hours and therefore summary judgment is not warranted.

### C. Liquidated Damages and Two-Year Statute of Limitations

        Defendant asserts that liquidated damages are not applicable in this case because it had a good faith belief that its financial specialists were exempt under the FLSA.  An employer who

---

        [61]Defendant asserts that Plaintiffs bear the burden of proof on this issue in establishing whether they performed work for which they were not properly compensated.  While this may be true at trial, at summary judgment, Plaintiffs only have the burden of demonstrating that there is admissible evidence that creates a genuine issue of material fact.

        [62]Mr. Kent was president of NMC, and Mr. Galloway was Chief Operating Officer of NMC.

violates the FLSA is liable for both unpaid wages and an additional equal amount of liquidated damages.[63] Under 29 U.S.C. § 260, a court must award liquidated damages unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . ."[64] "The good faith requirement mandates the employer have an honest intention to ascertain and follow the dictates of the Act."[65] "Reasonableness imposes an objective standard by which to judge the employer's behavior."[66]

The employer bears the burden in establishing that it acted in good faith and reasonably.[67] Here, Defendant asserts that it changed its compensation policy in late 2004 or early 2005, and this change was made based on recommendations by counsel to "be safe." In 2004, Defendant states that it paid solely on commission but after the compensation policy, financial specialists were allowed to keep a minimum monthly draw to ensure the specialist was paid a minimum wage. As stated earlier, Plaintiffs dispute this fact and it is unclear to the Court whether Plaintiffs are disputing the compensation policy prior to or after the change in policy. Even assuming that the compensation policy was changed in early 2005, there is a question of fact regarding whether Plaintiffs worked in excess of 40 hours a week.[68]

---

[63]29 U.S.C. § 216(b).

[64]*See also Dep't of Labor v. City of Sapulpa*, 30 F.3d 1285, 1289 (10th Cir. 1994).

[65]*Id.* (citations and quotations omitted).

[66]*Fowler v. Incor*, 279 Fed. Appx. 590, 600 (10th Cir. 2008)(citation and quotation omitted).

[67]*Renfro v. City of Emporia*, 948 F.2d 1529, 1549 (10th Cir. 1991).

[68]Although Defendant asserts that Plaintiffs were highly compensated, Defendant stated that each Plaintiff made more than $1339 a month and directed the Court to thirty-two exhibits to support this factual assertion. The Court notes that the second exhibit it reviewed did not support Defendant's assertion, and the Court performed no further analysis on the approximately 30 remaining Plaintiffs. In addition, whether Plaintiffs were appropriately

-16-

Defendant also asserts that prior to the change, Mr. Kent, the president of the company, believed financial specialists were exempt from FLSA because they were "outside sales or commission people" and that NMC had never received complaints or been sued regarding overtime or minimum wages.  Mr. Kent became aware that banks were being held liable for wage laws, but he was unaware that other mortgage companies were being found liable.

Defendant also states that financial specialists were required to sign a form acknowledging that overtime was not to be granted unless the financial specialist first obtained written authorization.[69]  Plaintiffs, however, assert that they worked over 40 hours each week and that they were instructed not to fill out their time cards with hours over 40 even though they actually worked more hours.  There are numerous issues of material fact and credibility determinations regarding Defendant's actions both before and after the 2005 change in compensation policy that this Court will not make.  If a genuine issue of material fact remains as to whether the employer acted willfully, summary judgment is not appropriate.[70]  As such, the Court finds that Defendant is not entitled to judgment as a matter of law, and summary judgment on this basis is denied.

In addition, Defendant asserts that a two-year statute of limitations should apply limiting Plaintiffs' damages to October 1, 2005 because it did not knowingly or recklessly disregard whether its conduct was prohibited.  A two year statute of limitations applies to FLSA claims except where an employer acts willfully, and then a three-year period applies.[71]  "A plaintiff meets the willful

---

compensated will need to be determined after the determination of each Plaintiffs' hours.

[69]Although Defendant provided this blank acknowledgment form to the Court, the Court is unclear the date on which this form was promulgated or when Plaintiffs received this form.  In addition, Defendant provides no evidence that any Plaintiff signed this form.

[70]*Overly v. Black & Veatch Corp.*, 2006 WL 1517761, at *5 (D. Kan. 2006).

[71]29 U.S.C. § 255(a); *see also Fowler*, 279 Fed. Appx. at 600.

standard by showing that the employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"[72]

The employee bears the burden in establishing that the employer acted willfully.[73]  Although the employee bears the burden of proof at trial in establishing the employer's willfulness, the Court finds that Plaintiff has come forward with sufficient evidence demonstrating genuine issues of material fact.  For substantially the same reasons as stated above, there are numerous factual disputes and credibility determinations to be made.  Accordingly, Defendant is not entitled to summary judgment.

**IT IS ACCORDINGLY ORDERED** this 6th day of May, 2009  that Defendant's Motion for Summary Judgment (Doc. 124) is hereby DENIED.

**IT IS SO ORDERED**.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[72]*Overly* , 2006 WL 1517761, at *4 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)).

[73]*Fowler*, 279 Fed. Appx. at 600 (citing *McLaughlin*, 486 U.S. at 135).

-18-